UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION



UNITED STATES OF AMERICA,

    Plaintiff,

v.

PAUL WILLIAM HILTON,

    Defendant.
_____/

CRIM. CASE NO. 10-20766

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

## ORDER DENYING DEFENDANT'S "MOTION TO SUPPRESS EVIDENCE – BLACKBERRY SEARCH"

On January 23, 2013, Defendant Paul Hilton filed the instant motion to suppress all evidence derived from the search of a Blackberry cell phone.

Defendant's "Issue Presented" goes further than the caption:

> Whether, because Paul Hilton's May 11, 2010 confession was compelled, involuntary and in violation of the Fifth Amendment, this Court should suppress all evidence derived from the forensic examination of the Blackberry cell phone and Defendant's November 3, 2010 interview statements.

Brief, at page v.

On February 13, 2013, the United States filed a Response in opposition. On February 20, 2013, Defendant filed a Reply Brief. The Court held a hearing on February 28, 2013.

United States Probation Officer (P.O.) Clinton Vestal (E.D. MO), Defendant Hilton's P.O., accompanied by other probation officers, and St. Charles Sheriff's Deputies, including forensic examiner Todd Roth, arrested Defendant at his front door at about 9:40 a.m. on May 11,

1

2010.

Plaintiff contends that Defendant Hilton, was immediately restrained and removed to a police car by P.O. Vestal while the rest of the search group entered and conducted a search. Plaintiff contends that the search violated his rights under the Fourth Amendment because he was not requested to consent to a search prior to the officers' entry and search. The search uncovered a Blackberry device in a kitchen drawer, which contained incriminating pictures and information.

Plaintiff further contends that while in the car, Hilton was questioned by P.O. Vestal, without receiving his *Miranda* warnings, and was coerced into admitting, in violation of his Fifth Amendment right against self-incrimination, that he possessed a Blackberry that contained images of child pornography, and that it was located in a kitchen drawer.

## **HEARING TESTIMONY OF P.O. CLINTON VESTAL**

In the instant case, P.O. Vestal learned that Hilton had violated several terms of supervised release through an email from an unknown individual named "Keith," to a County Deputy who provided it to Vestal. That email was corroborated in significant part by P.O. Vestal and other officers prior to taking the information to U.S. District Judge Rodney Sippel for his evaluation and verbal approval prior to the search.

P.O. Vestal's testimony at the evidentiary hearing on November 16, 2012, was that he was first called by and then forwarded an email that Detective Spencer of the St. Charles County Sheriff's Department had received on May 7, 2010 from an individual named "Keith". Hearing, P.O. Vestal, Pp. 47-48. That email identified Defendant Paul Hilton by name, and pointed to a Mocospace website featuring Hilton naked wearing a Santa hat, and taking pictures of himself using a mirror. Tr. Pp. 48-49. "Keith" further identified Defendant Hilton as a parolee (close

enough; supervised releasee) who should not be taking photos with his cell phone – itself a supervised release violation – who also was prohibited internet access. *Id.* Tr. P. 50. Keith also identified two links to Hilton's profile pages on Mocospace, a social network like Facebook. *Id.* 51.

The testimony of P.O. Vestal also established that the Mocospace.com profile contained a picture of Defendant Paul Hilton in his living room, which P.O. Vestal recognized, as having visited recently, and that the picture was taken by Hilton looking into his living room mirror. Vestal *Id.* 52-53. P.O. Vestal further testified that the cell phone he had authorized Defendant Hilton to use during supervised release, was <u>not</u> capable of taking pictures. This evidence, email and significant corroboration, established proof of Defendant Hilton was engaging in a multitude of supervised release violations. Vestal *Id.* 54.

Further, below the Mocospace photograph of Defendant Hilton, there is a profile page name: "Fat.naked.Santa.," with accompanying data of his gender and age: 49 male – which was Mr. Hilton's age in May 2010.

The Mocospace profile content stated:

> Abusing naughty little girls and corrupting the nice ones. Hey moms, bring your little ones to Santa's naughty playhouse and watch them suck this rock hard pole.

*Id.* 59. P.O. Vestal testified that these statements are consistent with some of Defendant Hilton's sexual desires – women bringing their children to him, and for him to sexually abuse the children. *Id.* 59-60.

Vestal further testified that the pictures were recent because Defendant had only been living at his sister's house with the identifiable living room since his recent release from prison,

and also had gained weight around May 2010 when that Mocospace picture was taken. *Id.* 61-62.

To cut to the chase, there was more then an abundance of reasonable suspicion supporting the actions of P.O. Vestal at the house: going to the house, questioning Defendant Hilton, and searching the house. The Defendant-specific information from the Keith email was corroborated by P.O. Vestal:

1. The Mocospace page – the address came from Keith's email. Tr. P. 62.

2. The Santa pictures showed Hilton's new girth, his sister's living room, and a phone camera in his hands via the mirror shot of a naked fat Santa.

Vestal testified that he corroborated the Keith email's identification of the service provider for Defendant Hilton's new cell phone, which he was forbidden from possessing – Sprint. *Id.* 65-67.

Vestal further testified that Keith provided his telephone number in the email and an email address. These are further indicia of his reliability as an informant, since he was willing to identify himself, and if he had provided false information, he could have been subject to prosecution for filing a false police report. *Id.* 67-68.

Finally, Vestal summarized that he had not given Hilton permission to:

        1. Create a Mocospace profile
        2. Use a phone with a camera
        3. Be on the internet
        4. Use an internet-capable device
        5. Post naked pictures of himself on line

*Id.* 68-69.

Vestal then stated that based on all this information, he believed that he had reasonable

4

suspicion to carry out a search at Hilton's residence. Vestal testified that he confirmed his conclusion with his boss, the chief probation officer in the Eastern District of Missouri, who went to U.S. District Judge Rodney Sippell (E.D. MO) to apprise him of that information and the intent to search pursuant to the supervised release conditions. Judge Sippel did not object. *Id.* 69-71, 114.

Vestal testified that he was not inside the house at the time of the search. *Id.* 77. and that the search team was active in the house at the time of Vestal talking with Defendant Hilton. *Id.* 103.

Finally, Vestal testified that he was aware of Defendant Hilton's presentence report (Gov't Prop. Ex 7) from his June 27, 2002 sentencing, which contained "Yahoo briefcases" establishing his deviant interest in young girls that corroborated Vestal's information about Hilton's recent conduct. The briefcases contained these titles:

> Fat Ugly Daddy
> Fat Ugly Molester
> Fat Naked Daddy
> A Sadistic Daddy
> A Sadistic Molester
> Daddy 40 Daughter Nine
> Evil Daddy 666
> Evil Sadistic Daddy
> Fat Hairy Daddy

*Id.* P.111. Vestal further testified that virtually all of these past profile screen names contain three word phrases connected together, which are quite similar to the recent Mocospace profile name: Fat.naked.Santa. *Id.* 111-112.

## FOURTH AMENDMENT ANALYSIS

The Court concludes that Hilton's consent was not required for P.O. Vestal's team to

enter and search the premises, because Condition #10 in Defendant Hilton's supervised release papers authorized his probation officer to search his residence for his computer and portable electronic communication devices, that would include his Blackberry.

Since it is not clear from the testimony whether that information was communicated to the search team before or after the Blackberry was seized, the Court will assume for purposes of this Motion that it was communicated before the seizure.

The Court further concludes that Hilton's police car admission to P.O. Vestal, that the Blackberry device was in the kitchen drawer, and the fact that Vestal communicated that information to the agents inside the house, does not form the only basis to uphold the seizure of the Blackberry device.

The Court concludes that the seizure should be upheld based on the doctrine of inevitable discovery. The "inevitable" discovery rule, adopted by the Supreme Court in *Nix v. Williams*, 104 S.Ct. 2501 (1984), is a variation upon the "independent source" theory. This variation is explained in LaFave, Israel et. al. Criminal Procedure 3d Ed. 2007 §9.3(e) Pp. 428-29:

> But it differs in that the question is not whether the police did in fact acquire certain evidence by reliance on an untainted source but whether evidence found because of an earlier violation would inevitably have been discovered lawfully.

The Criminal Procedure hornbook elaborated:

> As the Supreme Court explained in *Nix v. Williams*, the inevitable discovery doctrine is analytically similar to the independent source doctrine, in that both are intended to ensure that suppression does not outrun the determinant objective: the prosecution is neither "put in a better position than it would have been if no illegality had transpired" nor "put in a <u>worse</u> position simply because of some earlier police error or misconduct."

*Id.* P. 430.

Here, the investigating officers were properly in the house conducting a thorough search while P.O. Vestal was talking to the defendant in the car, and would have, quite independently of what Defendant Hilton told Vestal in the car, discovered the Blackberry; his supervised release conditions, discussed *infra*, granted them the right to search, and one of the reasons supporting the search was his possession and use of an unauthorized portable electronic communication device.

At the time of the search, Defendant Hilton was on supervised release for convictions for transportation and distribution of child pornography. Probation Officer Vestal had supervised Hilton from February 2009 until the date of his arrest, May 11, 2010. Hilton's conditions of supervised release included:

> *Standard Condition #3*: The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer.
>
> *Special Condition #7*: The defendant shall not subscribe to or use any internet service without first receiving written permission of the probation officer.
>
> *Special Condition #10*: The defendant shall <u>submit his person, residence</u>, office, computer, or vehicle <u>to a search</u>, conducted by a U.S. Probation Officer at a reasonable time and in a reasonable manner, <u>based upon reasonable suspicion of contraband or evidence of a violation of a condition of release</u> . . . .
>
> *Special Condition #11*: The defendant shall not possess or use a computer, gaming equipment with web and/or internet capability, or any audio/visual recording or producing equipment, except with the written permission of the probation officer.
>
> *Special Condition #12*: The defendant shall not possess or use a computer, peripheral equipment, or any other device with access to any "online computer services" at any location (including employment), or subscribe to or use any Internet service, without the prior written approval of the probation office. In addition, the <u>defendant shall consent to his probation officer or probation service</u>

<u>representative conducting random or periodic unannounced examinations of any computer(s) equipment to which he has access, other personal computer, and electronic storage devices to which you have access, including web enable (sic) cell phones.</u> The examination may include retrieval and copying of all data from the defendant's computer(s), or any computer(s) to which the defendant had access, and any internal and external peripherals to insure compliance with this condition and/or removal of such equipment for the purpose of conducting a more thorough inspection; . . .

(R.92: Motion to Suppress Evidence, Exh. B)(emphasis added).

That Detective Roth's post-seizure warrant affidavit for the contents of the Blackberry included a statement that was suppressed, does not require Fourth Amendment suppression of the findings of his forensic examination because there was no need for law enforcement to seek a search warrant given Defendant Hilton's Special Conditions of Supervised Release 10 and 12.

**FIFTH AMENDMENT ANALYSIS**

Plaintiff cites to the Ninth Circuit decision in *United States v. Saechao*, 418 F.3d 1073 (9th Cir. 2005), in support of his claim that his Fifth Amendment privilege against self-incrimination was violated by P.O. Vestal's May, 2010 questioning in the police car, after he had been secured.

In *Saechao*, the Defendant probationer provided "incriminating information to his probation officer in response to questions from that officer, . . . pursuant to a probation condition that requires him to 'promptly and truthfully answer all reasonable inquiries from the officer or face revocation of his probation . . . .". *Id.* 1075. The Ninth Circuit suppressed his statements, concluding that the state's requirement, that Defendant choose between admitting criminal conduct and jeopardizing his conditional liberty by remaining free, violated his Fifth Amendment right by compelling him to incriminate himself.

This Court does not find the Ninth Circuit decision in *Saechao* controlling in the instant case because this search rests upon a search consent (Fourth Amendment) contained in Defendant Hilton's conditions of supervised release, not on Defendant Hilton's statement (Fifth Amendment) to his probation officer. In addition, the Defendant Hilton was on supervised release after a prison sentence, while *Saechao* was on a probationary sentence, which indicates a lesser security concern. This Court concludes that the Supreme Court decision in *Samson v. California*, 126 S.Ct. 2193 (2006), supports this Court's decision, and undermines Defendant's reliance on *Saechao*.

The Court further concludes that there is no basis to suppress Defendant Hilton's post-*Mirandized* statements to law enforcement agents Donya Jackson and Jack Martin on November 3, 2010 at the Oklahoma City Federal Transfer Center.

The Court finds that those November 2010 statements are far attenuated from his May 2010 statements to P.O. Vestal, so that suppression is not appropriate. The Court has previously found those post-*Miranda* statements were voluntary. In the long interim between May and November, Defendant Hilton had access to a lawyer at his arraignment proceedings. And the November 2010 *Miranda* warnings would not have been lost on Defendant Hilton, who is very intelligent and has had many contacts with law enforcement agents.

Finally, this Court notes that in the Supreme Court decision *United States v. Patane*, 542 U.S. 630, 645 (2004) (Plurality Opinion), the decisive concurring opinion of Justices Kennedy and O'Connor states:

> Admission of non-testimonial physical fruits . . . even more so than the post-warning statements to the police . . . does not run the risk of admitting into trial an accused's coerced incriminating

statements against himself.

The Supreme Court decided to not apply the *Wong Sun* fruit of the poisonous tree doctrine to mere failures to give *Miranda* warnings. *Id.* 644. So too, here.

**CONCLUSION**

In *Samson v. California*, 126 S.Ct. 2193 (2006), Supreme Court held that a suspicionless search of a parolee did not violate the Fourth Amendment. Defendant Hilton, who was on supervised release after serving a federal sentence of incarceration at the time of the search, was comparable to the parolee in *Samson*. The *Samson* opinion noted that "parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment", and (citing *United States v. Reyes*, 283 F.3d 446, 461 (2d Cir. 2002)) "federal supervised release, in contrast to probation, is meted out in addition to, not in lieu of, incarceration." *Samson* at 2198.

The *Samson* decision, which rested its holding under Fourth Amendment principles, and not on the consent rationale discussed in *Schneckloth v. Bustamonte*, 93 S.Ct. 2041 (1973), or the special needs rationale discussed in *Griffin v. Wisconsin*, 483 U.S. 868 (1987), underscored the Court's concern about "the grave safety concerns that attend recidivism." *Id.* 2200. This Court finds that this concern is front and center in the instant case. The Supreme Court noted in *Samson*: "The touchstone of the Fourth Amendment is reasonableness, not individualized suspicion," and the "Fourth Amendment imposes no irreducible requirement of such suspicion," *Id.* 2201, citing for the second quote *United States v. Martinez-Fuerte*, 428 U.S. 543, 561 (1976).

As noted previously, this Court finds that P.O. Clinton Vestal had amassed an abundance of reasonable suspicion to support the search of Defendant's residence on May 11, 2010.

10

The Court further finds that Defendant Hilton's claim that "the content of the Blackberry phone was not pertinent to the supervised release charge filed by Officer Vestal" is not even close correct. Defendant's Reply Brief, Page 3. That content would have been a "spot-on" compelling basis for a supervised release violation. The fact that the conduct was also a basis for subsequent criminal charges does not disqualify it from supporting a supervised release violation.

There was no Fourth Amendment violation by the probation officers' entry of Defendant Hilton's house and retrieving the Blackberry device from the drawer in the kitchen. It is not critical to this decision whether the inside searching agents found the Blackberry before or after P.O. Vestal received its location from questioning Defendant Hilton in the car and then relaying that info to the insiders. What is relevant to this decision is that the probation officers were well aware that prior to the search, Defendant Hilton improperly possessed and used such a device inside the house, and that he had consented to such a search in his conditions of supervised release.

Finally, even if one could find a Fourth Amendment violation in Detective Roth's search warrant affidavit, the Court, having evaluated the officers' conduct in the instant case, would apply the "good faith" exception to the exclusionary rule set forth in *United States v. Leon*, 468 U.S. 897 (1984) and *Herring v. United States*, 555 U.S. 135, 137 (2009).

As to the Fifth Amendment claim, the Court does not find that Defendant Hilton's statements to P.O. Vestal in the car, without having received *Miranda* warnings, were involuntary. Hilton was quite used to interrogation by law enforcement personnel, and while he was not provided with *Miranda* warning, the Court does not find that he was coerced into making an involuntary statement.

Accordingly, for the aforestated reasons, the Court DENIES Defendant Hilton's Motion to Suppress.

SO ORDERED.

DATED:   APR 1 0 2013

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE